Twin City Theatres, A. A. Hull, Liquidating Trustee v. Commissioner.
Twin City Theatres v. Commissioner
Docket No. 28490.
United States Tax Court
1952 Tax Ct. Memo LEXIS 227; 11 T.C.M. (CCH) 454; T.C.M. (RIA) 52133; May 12, 1952
Grant Armstrong, Esq., for the petitioner. J. O. Durkan, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined for 1946 a deficiency of $1,029.82 in income tax and a deficiency of $8,844.83 in surtax under section 102. The only issue for decision is whether the taxpayer was availed of for the purpose of preventing the imposition of surtax upon its stockholders through the medium of permitting earnings or profits to accumulate beyond the reasonable needs of the corporation instead of dividing or distributing those earnings or profits. Findings of Fact Twin City Theatres was a corporation organized under the laws of Washington in 1923. It went into voluntary dissolution on January 31, 1950. Its income tax return for 1946 was *228 filed with the collector of internal revenue for the district of Washington. A. C. St. John was president, manager, and owner of all of the stock of the petitioner from 1941 until his death at the age of about 78 in December 1947. Thereafter, his widow owned 10 per cent and each of his two children owned 45 per cent of the stock of the petitioner. The petitioner was engaged in the operation of four motion picture theatres the Fox and Liberty Theatres in Centralia, and the St. Helens and Pix Theatres in Chehalis. They were the only theatres in those two towns or in the community which they served until a drive-in theatre was built on the highway between the two towns in 1950. The population of Centralia was about 9,000 and that of Chehalis about 6,000 in 1946. The two towns, within three miles of each other in Lewis County, Washington, were centers for a population of about 45,000. The petitioner owned all of the equipment in the theatres. It either owned or rented the building and real estate occupied by the Pix Theatre. It rented the buildings for the St. Helens Theatre and the Fox Theatre during 1946 from St. John Investment Company, all of the stock of which was owned by *229 A. C. St. John. The petitioner made repairs to those buildings when repairs were made. It rented the Liberty Theatre, a converted store building, from F. & S. Improvement Company under a lease dated August 20, 1937. The original term was six years from August 1, 1937. It was extended on September 7, 1940 to expire on July 31, 1948, with the option in the petitioner to extend the term for an additional two years, and it was again extended on August 18, 1948 for a term ending July 31, 1955. St. John had no interest in F. & S. Improvement Company. The petitioner was to keep the building in repair and replace any work oun or broken equipment. St. John had tried unsuccessfully to purchase the Liberty Theatre building. The theatres and the equipment therein were worn out and in poor condition in 1946. The carpets were threadbare, chairs were obsolete in design and were worn and broken, the draperies needed to be replaced, the marquees were outmoded and needed to be replaced, the projection and other equipment was old, and the interiors of the theatres needed to be redecorated. St. John, in 1946, consulted a man long engaged in the theatre equipment business and familiar with the theatres *230 of the petitioner, on the subject of refurnishing, reequipping and redecorating the theatres of the petitioner. He recommended a complete renovation and advised St. John that the cost would be at least $100,000, the work should all be done at one time, the Fox Theatre should not be renovated until he knew whether he would renew the lease or build a new building for the Liberty, and he should also delay until suitable materials and equipment, then not readily available, became available. He also estimated that it would cost about $175,000 to build a theatre to replace the Liberty. No renovating was done in 1946. Minutes of the meeting of the "Trustees" of the petitioner held on November 5, 1945, record that St. John stated the company would soon be in condition to do the contemplated re-equipping of all theatres and the reconstructing of leaseholds necessary to give good service to the patrons and eliminate possible competition, the cost would be substantial, and until the extent of the expenditures could be determined no dividends would be declared. Minutes of a meeting of the stockholders of the petitioner held on July 1, 1946, show that St. John again referred to the necessity *231 for improvements of leaseholds and equipment which had been neglected due to the war and stated that it was becoming more evident that the company would have to build its own theatre to replace the Liberty Theatre and, consequently, the payment of dividends at that time was not warranted. He suggested that $100,000 be set aside for the purchase of real estate and the erection of a theatre to replace the Liberty Theatre at such time as the directors deemed advisable. That suggestion was approved. The directors of the petitioner at a meeting on July 1, 1946, adopted a resolution that $100,000 be set aside for the purchase of real property and the erection of a modern theatre building thereon to replace the Liberty Theatre then on short term lease as soon as building conditions would permit. Minutes of a meeting of the directors of the petitioner on February 3, 1947, record that St. John was to make a trip to California to obtain information about new theatre construction since it appeared that the operation of the Liberty Theatre was unsatisfactory and it would be necessary to proceed with plans for a more modern theatre "just as soon as building restrictions and costs would justify. *232 " The only persons present at the meetings mentioned above were St. John and Mary Dosser who became his wife prior to July 1, 1946. Statements of the financial condition of the petitioner at the beginning and end of the taxable year are as follows: 12/31/45
12/31/46
Assets: Cash
$111,055.13
$150,130.73
U.S. Government bonds
25,700.00
25,700.00
Inventories
1,766.10
1,237.64
Investments
1,832.11
1,869.90
Equipment
75,973.07
76,551.02
Prepaid expenses
1,500.20
1,577.77
Total assets
$217,826.61
$257,067.06
Liabilities and capital: Accounts and notes payable
$ 11,708.81
$ 12,286.27
Accrued expenses and property taxes
6,572.96
7,071.01
Accrued federal income taxes
20,214.47
23,328.66
Reserve for depreciation
35,882.27
40,764.93
Capital stock common
500.00
500.00
Paid-in surplus
16,327.47
16,327.47
Earned surplus
126,620.63
156,788.72
Total liabilities and capital
$217,826.61
$257.067.06
The petitioner was using a substantial amount of worn out equipment in 1946, the cost of which had been completely written off through depreciation in prior years. The capital stock and paid-in surplus of the petitioner were the same *233 in 1946 as they had been during the preceding eight years. The earned surplus at the end of 1938 was about $27,000. The only dividend paid for the years 1938 through 1946 was $5,000 paid in 1940. The Form 1120 on which the petitioner made its return for 1946 called for an explanation of why earnings and profits had not been distributed and the petitioner stated therein "funds appropriated by directors for erection of new theatre in Centralia." The Commissioner determined that the net income of the petitioner for 1946 was $51,861.19, its undistributed section 102 net income for that year was $32,163, and the corporation was availed of for the purpose of preventing the imposition of surtax upon its stockholders through the medium of permitting earnings or profits to accumulate beyond the reasonable needs of the business instead of dividing or distributing such earnings or profits. If $32,163 had been included in the income of St. John for 1946, the resulting increase in his tax would have been $20,486.47. The earnings or profits of the petitioner were permitted to accumulate during 1946 beyond the reasonable needs of the business and it was availed of during that year for the *234 purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. Opinion MURDOCK, Judge: The petitioner had cash and government bonds in a large amount at both the beginning and the end of the taxable year. No reason for keeping such a large amount of earnings on hand in the form of cash appears except that determined by the Commissioner and those advanced by the petitioner. It is puzzling why such a large amount of the assets which were not needed or used in the business would be kept on hand in the form of cash which, of course, earned nothing. The fact that the funds were not invested in unrelated securities and were not loaned to stockholders is favorable to the petitioner's case. There is no evidence of how much capital the petitioner needed for the normal operation of its business in 1946, but clearly it did not need any part of its 1946 earnings for that purpose. Furthermore, it seems fair to assume that it did not need very much, if any, of its surplus for that purpose since there is no evidence to the contrary. Its surplus increased by $30,168.09 during the *235 year. The question is why did the petitioner accumulate rather than distribute that amount. Was it for the purpose of preventing the imposition of the surtax upon its shareholders? Section 102 (c) provides: "The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." The petitioner advances two reasons for retaining its 1946 earnings as an addition to its already large surplus instead of distributing them. They were needed, it says, for the replacement of obsolete and worn out furnishings and equipment and for renovating the four theatres operated by it and for the erection of a new theatre building in which to operate Liberty if the lease was not renewed. It is clear that the accumulation in 1946 of at least $100,000 of the total surplus was not beyond the reasonable needs of the business because that was required to renovate the theatres which were then badly in need of redecorating, refurnishing, and re-equipping. They had been neglected for *236 a long time and St. John not only knew in 1946 that the renovating should be done but he consulted the man whom he would normally engage to do that work. That man, fully qualified to do the work and estimate its cost, recommended a complete renovation of all four theatres. He made a rough estimate that the cost would be at least $100,000, and other evidence in the case indicates that he did not overestimate. However, he advised delay, feeling that it was in the best interests of his customer. St. John took his advice and did no renovating in 1946. The Commissioner points to the fact that not only was no renovating done in 1946 but none was done by the petitioner at any later date up to February 1949 when it sold the theatres. However, the evidence shows that the new owners immediately started renovating these theatres and spent as much money as they could afford in partially completing that work. St. John died rather suddenly about the middle of December 1947 as the result of a cold followed by pneumonia, and, consequently, no one knows what he would have done had he lived. The record shows that suitable materials and equipment necessary to put the theatres in first class operating *237 condition were still not readily available at the time of St. John's death. Those who inherited the stock of the petitioner from St. John sold the theatres within about a year after his death. Thus, there is little in the subsequent history of the petitioner to indicate that St. John did not have a genuine and sufficient reason in 1946 for retaining at least $100,000 to renovate the theatres within a reasonable time in the future. He was well along in years in 1946 but he was a vigorous man, actively engaged in operating the theatres, and was intending to continue the operation of the theatres. The retention of the entire surplus can not be justified on the basis of the renovation alone and the record does not show that the reasonable needs of the business in 1946 required the retention of some substantial part of the surplus as a hedge against the possible termination of the lease on the Liberty Theatre. Statements by St. John in minutes of meetings and in the petitioner's return for 1946 that it needed $100,000 of its surplus to erect a new theatre in Centralia are self-serving statements of a sole stockholder and must be weighed as such. The lease had one and one-half years to *238 run after 1946 and then could be renewed for two more years. If the petitioner had been required to build a building in which to operate the Liberty Theatre, no doubt the cost would have exceeded $100,000. However, the petitioner never considered the purchase of any particular land in Centralia or any plan for the erection of a theatre. Furthermore, it is not clear that the petitioner owned any of the buildings in which it operated its theatres. Counsel for the petitioner introduced in evidence without objection a deed of the St. John Investment Company to the petitioner dated May 16, 1938, to show that the record title to the Pix Theatre was in the petitioner, whereas counsel for the respondent introduced into evidence without objection comparative balance sheets of the petitioner for the years 1938 through 1946 which show as an asset land and buildings in the amount of about $38,000 up to the close of 1941, but show no such assets thereafter. The petitioner did not explain how it could continue to own the Pix real estate during the taxable year without showing any real estate as an asset on its balance sheets for that year. If real estate were shown as an asset, the accumulated surplus *239 to be explained would be increased in a like amount. Thus, it appears that St. John Investment Company owned at least two of the theatres operated by the petitioner and perhaps the Pix in addition. The petitioner would need no funds for a building if its practice was to occupy only buildings rented from others. The evidence indicates that the possibility of an outsider opening a theatre in Centralia was not great and the petitioner's argument that the preservation of its monopolistic position required it as a matter of good business to stand ready to purchase real estate and construct a new theatre at a cost of about $175,000 is not persuasive. It is of significance that St. John was a man of considerable wealth and the corporation never declared a dividend after he became its sole stockholder. It was to his advantage taxwise to have the corporation retain its 1946 earnings rather than distribute them to him even though section 102 should apply because his tax on those earnings would be greater than the surtax imposed on the corporation under section 102. It is possible that he was aware of that fact and allowed the corporation to retain the earnings even though it already had all *240 of the earnings which it might reasonably need in its business. The petitioner has failed to show by a fair preponderance of the evidence that its earnings were not permitted to accumulate beyond the reasonable needs of its business or that it was not availed of during 1946 for the purpose of preventing an imposition of the surtax upon its sole stockholder through the medium of permitting those earnings to accumulate instead of being distributed. Decision will be entered for the respondent.